JAMES E. PATTON v. ROBERT GREGORY.

To the general rule, that heirs, devisees, &c., are not allowed to sue for the recovery of the debts or property of an estate, pending an administration, there are well established exceptions.

Where an administrator, after the lapse of nearly six years from the death of the intestate, without effort during that time to protect the interest of the estate, refused to bring suit for property, held to be an exception, and to authorize suit by the heirs.

It seems that such a neglect, without a refusal, would also constitute an exception to the general rule.

Where the evidence as to the main issue is conflicting, it is for the jury to reconcile the conflict, or to find upon the evidence, which they regard as most entitled to belief; and their verdict, so found upon this state of facts, will not be disturbed.

Where irrelevant testimony, or such as could have no sensible influence on a jury, is offered and rejected, or objected to and received, it is no ground for a reversal.

It is not error to refuse charges, which, however, true as propositions, have no bearing on the case, and which are not calculated to enlighten the jury or assist them in drawing conclusions from the facts.

In a verdict, the words, "We, the jury, *believe*," &c., are equivalent to, We, the jury, *find*, although the latter is the better form.

Appeal from Navarro. Tried below before Hon. C. A. Frazer.

Suit to annul and set aside a deed of gift, in writing, made to appellant's intestate, by James Hughes, deceased, of whom appellees are heirs-at-law, in which character they sue.

The material averments of the petition are that James Hughes departed this life some time in the month of December, 1846, leaving an estate, real and personal ; that one Moses M. Hughes sets up a claim to a portion of said estate, which is described. That the claim of said Moses M. Hughes to

the lands and property described is without foundation, and is set up by him with the view and design of defrauding the petitioners out of their just rights as heirs-at-law of the said James Hughes, deceased, and with the intention of converting the same to his own use and benefit; that the instrument, under which said Moses M. Hughes claims the property sued for, never was executed by James Hughes, and that it is set up in fraud; that if any such instrument ever was executed by Jas. Hughes, deceased, it was done during the last illness of the said James, and "when so far gone as to be wholly unconscious of the things of life," and incapable in mind of making such instrument, or of making any other disposition of his property; and that it was a fraudulent contrivance adopted by said Moses M. Hughes, under the circumstances, to appropriate said property, and to defraud the petitioners. In an amendment to this petition, they alleged that administration on the estate of said James Hughes, deceased, was granted to Wm. Croft, who refused to bring suit for said property.

The appellant filed exceptions to the petition, the first of which were sustained, and the appellees amended. The answer of appellant denied the allegation in the petition, and relied upon the deed of gift. Upon the main issue in the cause, which was the condition of James Hughes' mind at the making of the deed, the evidence was conflicting and irreconcilable. One witness says that James Hughes, at the time the deed of gift was signed, was out of his proper mind and did not know what he was doing, that he died in a few minutes after executing the deed, thinks he did not live exceeding thirty minutes afterwards. Two other witnesses corroborate fully this testimony, and one of them (Crockett) says "that he saw James Hughes sign a paper, which was called a deed of gift. Everard held the paper and Pilant or Barton held Hughes' hand to the paper, at the time of executing it. James Hughes was at the time speechless, and had the death rattles on him

at the time, and was dead in a few minutes after he was laid down on the bed. At the time of the signing of the deed, witness thought, and still thinks, that he (James Hughes) was entirely incapable of understanding what he was doing, that he did not appear to pay any attention to surrounding objects, or answer when spoken to. Immediately after he was laid down from signing the paper, witness spoke to him, himself, and he paid no attention to him and made no reply."

On the part of the appellant, two witnesses testified that James Hughes, at the time of making the deed, was in his sound mind, and that it was executed some two or three days before his death.

On the trial, the deposition of a witness was offered by the appellee, in which was the following question and answer : " Did you or not hear any person make any statements to Moses Hughes about his connection with the property of James Hughes," &c. ?

Answer. " I heard something said at the time about Moses Hughes swindling his brothers and sisters, out of Jas. Hughes' property, but I don't recollect precisely what. The actions of Moses Hughes caused a good deal of excitement against him, as he appeared to exult in the death of his brother ; and there was some talk of kicking him out of the camp. The above took place just about the time James Hughes died." To the reading of this answer in evidence, the appellant objected, and the Court sustained the objection to the first part of the answer, and overruled it as to the remainder, commencing with " the actions of Moses Hughes,' &c., to which ruling the appellant excepted.

The Court charged the jury substantially as follows: "You will first consider whether James Hughes, at the time he executed the deed of gift, a copy of which has been read to you, had sufficient mental capacity to know and understand what he was then doing, and if he had, you will stop the investiga-

tion of the case, and return a verdict for the defendant. But if you believe that he had not, you will return in your verdict that he had not sufficient mental capacity to know and understand what he was then doing. You will next consider, whether at the time this suit was commenced, the administrator of the estate of James Hughes refused to bring suit to recover this estate. If the testimony is conflicting, you will endeavor to reconcile it, but if you cannot, find in favor of that which is most entitled to belief." Other instructions were given in regard to the heirship of the parties, and the administrator, and in regard to the value of the personal estate, and the length of time it had been in possession of Moses Patton, and as to the disabilities of the plaintiffs, &c.

The verdict was as follows : "We, the jury, believe that James Hughes was out of his right mind, when he signed the deed of gift."

"We, the jury, find they are the heirs of James Hughes.

"We, the jury, find that the administrator of James Hughes refused to bring suit.

"We find that Robert Gregory is the administrator of James Hughes, and James E. Patton is administrator of Moses Hughes. We, the jury, find that fifty-four head of cattle went into the possession of Moses Hughes, worth $324, with increase worth $2734 00.

"We, the jury, do not know whether or not there were any minors."

Judgment was rendered annulling the deed of gift, and vesting the title of the land therein conveyed, in the heirs-at-law of James Hughes.

The appellant assigns various errors, reaching all the rulings of the Court, the verdict and judgment.

*J. E. Cravens* and *J. W. Ferris*, for appellant.

*C. M. Winkler*, for appellee.

Patton  v.  Gregory.

HEMPHILL, CH. J.   The first question is, as to the right of the plaintiff to bring the suit.

The general rule is, that heirs, devisees, &c., should not be allowed to sue for the recovery of the debts or property of an estate pending an administration ; but there are exceptions as well established as the rule itself.   Some of these will appear from cases in which the subject was matter of inquiry. (2 Tex. R. 82, 400 ; 4 Tex. R. 187 ; 8 Tex. R. 182 ; 7 Tex. R. 210 ; 10 Tex. R. 560.)   It may be remarked that the exception against the heirs, as improper parties, has not been sustained in any except the two causes reported in the second volume, and from the tendency of the decisions such exception does not seem to have been favored.

The administrator after the lapse of near six years from the death of the intestate (without effort during that time to protect the interests of the estate) refused to bring suit for this property, and the plaintiffs had but the choice either to bring the action themselves or to rely upon the solvency of the administrator and his bond for redress.   That the personal remedy against the administrator would be ineffectual may well be presumed.   His bond must have been for a comparatively small amount, as the lands sued for were not included in the inventory and even if they had been the increase of their value would most probably far exceed the penalty of the bond.

The old rule that the heirs, &c., cannot sue unless there be collusion or insolvency on the part of the executor or some special case (2 Williams on Executors, 1730 ; 6 Johns. Chan. 132 ; 2 Ves. Jun'r., 95 ; 6 Ves. 573 ; 11 Ves. 29) should be liberally construed under our system, which subjects not only personal but also real property of an estate to administration and where lands are so constantly appreciating that in a few years they may have increased five hundred or one thousand per cent. beyond their appraised value at the grant of administration.

It is not necessary to support actions of this character that there should have been collusion or insolvency on the part of the executor or administrator. In Consell v. Bell, the testator had executed an instrument purporting to convey furniture, plate, watches, &c. He afterwards made a will and his executors not conceiving that the deed was fraudulent or obtained by undue influence delivered the property embraced in it to the vendee, held that the vendee was a proper party to a suit brought by a legatee against the executors for the administration of the estate and against the vendee for the cancellation of his deed and for repayment by him of the money, return of the furniture, &c., although the bill contained no charge of collusion with or insolvency of the executors. (1 Young and Collier, 569.) In 3 Little, p. 177, the right of heirs to sue on refusal by an administrator was acknowledged.

By law the whole of an estate vests in the heirs testate or *ab intestato* at the death of a person deceased. It passes from them *sub modo* for the purposes of administration, and the administration is required to be speedy so that the remainder, if any, may be returned to its real owners the heirs. The neglect of an administrator for six years would, perhaps of itself, be sufficient ground for the heirs to sue, and this, in connection with the positive refusal of the administrator to bring the action, we believe to be good ground for an exception to the general rule, and that the demurrer for the want of parties was properly overruled. Had there been any defect from the want of parties this was cured by the administrator *de bonis non* joining in the suit with the plaintiffs.

I shall not attempt to discuss *seriatim* all the points raised by the assignments of error.

The cause is almost purely a question of facts, and, though somewhat out of the regular order, we will first consider whether the verdict is supported by the evidence.

The controlling and substantially the only issue was as to

the soundness of the mind of the donor at the time of executing the deed of gift. The effort on the part of the plaintiff was to show that the deed was invalid from the incapacity of the maker and not that it was forged. On this issue several witnesses testified in behalf of the plaintiffs in substance that the instrument was executed when James Hughes was in a dying condition; that the death rattle was in his throat; that it was not at furthest more than thirty minutes before he expired, and that he was incapable of understanding what he was doing. On behalf of the defendant two witnesses proved that the deed was executed a day or two before his death, and that he was at that time, and afterwards, of perfectly sound mind; and another witness testified as to the soundness of mind until within five or six hours of the close of his life. The evidence of the witnesses as to the main issue was in conflict and it was for the jury, as charged by the Court, to reconcile the conflict or to find upon the evidence they regarded as most entitled to belief. Their verdict for the plaintiff on this state of facts cannot be disturbed by this Court. It is neither without nor against evidence. It is amply supported by four of the witnesses. It was for the jury to judge of the weight of the testimony, the credibility of the witnesses, and their finding cannot, under the facts, be impeached. I will now examine some of the more important assignments of the appellant. There is no force in the objection that the Court erred in ruling out a portion of the deposition of Pilant, a witness for defendants. What could have induced the plaintiffs to object, or the Court to sustain the objection to the evidence is a matter of some astonishment. The interrogatory may have been obnoxious perhaps to the objection that it was leading in its character. But the evidence was not of the slightest importance. There was in substance no issue on the execution of the deed, and if there had been, this witness had several times in other parts of his deposition testified to the fact of the signing of the deed by

Jas. Hughes. The evidence ruled out on this point was at least but cumulative, and all that the witness said about the place where he last saw the deed and what he answered at the time of taking his deposition on another occasion, testifying in fact that he did not know what he answered was purely irrelevant. And the exclusion of it operated no prejudice to the defendant ; nor was there such error in admitting the portion of the testimony of Crockett objected to as would authorize a reversal.

The jury must be presumed to have ordinary intelligence, and when we look at the mass of the testimony in this cause it is most obvious that the evidence of Pilant, which was rejected, and that of Crockett, which was received against the objection of defendant, could have had no sensible influence on the minds of the jury. Can any one pretend that if this part of the evidence of Crockett had been excluded the finding of the jury would have been changed or in any degree affected ? The making of the instrument, the whole transaction was in the midst of a company of Rangers of which the donor and donee were members. And the statement of the witness objected to was as to the brutal conduct of the donee and the excitement caused against him by the transaction in the camp. But the exultation of the donee over the death of his brother was in substance proven by another witness without objection, and if such evidence can be imagined to have influenced the jury, the effect had already been wrought upon their minds and whether the evidence by Crockett was excluded, or not, the effect would have been the same. But such evidence could have had no perceptible influence on the minds of men who were inquiring simply whether the donor at the making the deed was of sound mind or not, and its exclusion or admission is not a ground of error.

Nor was there error in refusing to give the special charges asked by the defendant. These were to the effect that the burden of proof as to the mental unsoundness of Jas. Hughes,

or his incapacity to make the deed, was upon the plaintiffs and that the legal presumption is that the party was of sound mind unless the contrary was proved.

The jury had heard the evidence of four witnesses on behalf of the plaintiffs testifying strongly as to the incapacity of the donor at the time of making the deed, and the evidence of three witnesses on behalf of the defendant, testifying in the most clear and positive terms that he was of sound mind, and upon this they were charged by the Court to consider and find whether James Hughes, at the time he executed the deed, had sufficient mental capacity to know what he was doing. The issue of soundness or unsoundness upon the evidence was thus distinctly presented to the minds of the jury. There could be no middle ground. There was no room for doubt. The evidence was in conflict, and if one class of witnesses was to be believed, the donor was of unsound mind ; of the other, he had capacity to make the deed. All the facts were before the jury and they were to find upon them as to the capacity of the donor. Could it have been of any consequence to the jury to know which party should have proved the unsoundness, or under such evidence as was before them to learn that the law would presume soundness until the contrary was proven ? The plaintiffs had been offering facts and laboring to prove unsoundness—why should the jury be told that he had done the very thing which he ought to have done—was there any probability—was it conceivable that they would be so stupid as to find the man unsound in mind unless there was convincing testimony to that effect ? And why should they be told that until the contrary was proven sanity must be presumed. They had all the facts before them. Such abstractions would not have assisted them in drawing conclusions from the facts. Their effect, if any, would have been to distract and confuse and divert their attention from the real issue. The issue of capacity, or not, was fairly put by the Court to the jury, and

there was no error in refusing charges which, however true as abstract propositions, could have no bearing on the case and would not enlighten but tend rather to obscure and confuse the facts before them and upon which they were to find.

The objection to the form of the verdict on the first and main issue was not good ground for a new trial. Instead of saying " we the jury find that James Hughes was out of his right mind," &c., they say " we the jury believe that James Hughes," &c. The first form of expression would have been the better, but they are in fact equivalent. What they find or what they believe is from the evidence, and in either form of expression amounts to the same thing.

It would be a waste of time to engage in this case in a discussion of the doctrines in relation to mental soundness or unsoundness. The facts in evidence leave no room for doubt. The deceased, upon the evidence, was very clearly either sound or unsound, and there was no room for inferences from extraneous facts or circumstances and, if there were, they would not operate to the advantage of the defendant.

There might be objection, perhaps, to some of the issues presented by the Court, and the failure to make a distinct issue with reference to the effect of the Statute of Limitations on the right of the defendant in the personal property.

But this cannot be ground of error. The judgment vests the lands only in the estate of James Hughes or his heirs, and in effect concludes in favor of the defendant that estate and the heirs as to the personal property.

There is no necessity to enter upon the examination of important questions which might have arisen had the judgment been for the plaintiffs as to the personal property.

We have not noticed all the points raised in this cause. They have been fully and very ably examined and discussed and illustrated by the arguments of counsel. They have been considered by the Court, and we believe that they are not

sufficient to require this cause to be remanded to the District Court. It is ordered that the judgment be affirmed.

Judgment affirmed.