[No. 1647.]

JOHN HESTER *v.* THE STATE.

1. PRACTICE IN THE COURT OF APPEALS—EVIDENCE.—In felony cases less than capital, and in misdemeanor cases, judgment of conviction will not be reversed on account of the admission of illegal evidence against the accused, unless such evidence was material and relevant and the legal evidence insufficient to warrant the conviction. In such cases this court looks to the whole record in determining whether the illegal evidence was relevant and material. This rule, however, does not obtain in capital felonies on appeal; and, on the contrary, this court will reverse a capital conviction on account of the admission of illegal evidence to which the defense duly reserved exceptions, and will not look to the whole case to ascertain whether there is sufficient legal evidence to sustain the conviction, or whether the verdict was influenced by the illegal evidence.

2. HEARSAY EVIDENCE.—In a trial for the theft of twelve sheep the proof of the *corpus delicti* was wholly circumstantial. The State's theory was that the sheep were taken at night out of the owner's pen, and the court below, over the defendant's objection, permitted the owner to testify that, about the time of the alleged theft, and prior thereto, his herder told him that the sheep pen gate had been opened the preceding night by some unknown person. *Held*, that what the herder told the witness was hearsay, and should not have been admitted over the objection of the defense; and that, in view of the other proof adduced to establish the *corpus delicti* and inculpate the defendant, this hearsay evidence was material and well calculated to prejudice the defendant's rights.

3. EVIDENCE.—The owner testified that he had lost some sixty sheep and could not account for them unless they were stolen; that, in a flock purchased by a neighbor from the defendant, he, the witness, within a month after their loss, found the twelve sheep described in the indictment, and that his marks and brands on them had recently been overlaid with the defendant's marks and brands. Over objection by the defense, the witness was further allowed to testify that in the same flock he also found other and similar sheep which had been similarly re-marked and re-branded, but that the original marks and brands had been so ef-

faced that he could not identify these sheep as his. *Held*, that this testimony was admissible as a link in the chain of circumstances relied on by the State to connect the defendant with the theft of the sheep described in the indictment. See the opinion *in extenso* with regard to other evidence admitted by the court below, the legality of which depends upon dates and circumstances not sufficiently developed at the trial.

4. Same—Hearsay.—A person who was present when others were negotiating a trade between themselves, and who heard them make the trade, is a competent witness to testify to it. His testimony to it is original, not hearsay.

Appeal from the District Court of Gonzales. Tried below before the Hon. Everett Lewis.

The indictment charged that on the first day of March, 1882, the appellant fraudulently took, stole and carried away from the possession of J. C. Stewart twelve head of sheep, of the value of four dollars each, the property of said J. C. Stewart. The case was tried in January, 1884, and the jury found the defendant guilty as charged in the indictment, and assessed his punishment at a term of four years in the penitentiary.

J. C. Stewart, the owner of the sheep alleged to have been stolen, was the first witness for the State. He testified that, in the latter part of February, 1882, his herder informed him that his sheep pen gate had been opened the previous night, and he went to look at it, and found it fastened in a different way from the way it was always fastened. Witness knew it had been fastened in the usual way the night before, though he neither fastened it himself nor saw it fastened. It was always fastened by using three links of a chain, but when witness went to look at it on the occasion spoken of, he found it fastened with six links of the chain, by dropping the links through another link. The gate of the pen turned on the side, and slipped in between a peg and a post. On the occasion spoken of, witness found it clear outside of the peg, and not fastened as it had been the night before. He examined for tracks of sheep and men at and in front of the gate, but found none. The ground was too hard to show tracks. Witness had been told by his herder that the gate had been opened twice up to the time of which he had been speaking. Soon after the last occasion, witness counted his sheep, and discovered that they were short about a hundred head. About thirty or forty of the hundred were lost by death. Witness could not say how the others got away. His flock consisted of twelve or thirteen hundred head. In that number a good

many will die and straggle off, but witness knew of about a dozen of his sheep, which had got among his neighbors' flocks. Arrington's ranch is about one and a half or two miles from the witness's. About the latter part of March, 1882, witness and others went to the ranch of Floyd & O'Neal to examine their flock of sheep. In that flock they found twelve head of sheep which witness claimed to be his. Of these twelve there were nine on which the witness's brand, on the jaw, had been partly run over with a burnt brand on the face and nose. On three of the nine witness's brand was still plain. On the other six it was not so easily discerned. The witness further described the alteration and defacement apparent upon the twelve sheep found in Floyd & O'Neal's flock, and recognized by him as part of the sixty or seventy head which he had missed from his flock in the latter part of February, 1882. The twelve sheep, when found by witness, were claimed by J. L. Floyd and C. O'Neal, and were in their possession. Witness recovered them in March, 1882; they had been taken without his consent. Witness knew that these twelve head were his property. He recognized them by their brands on both the flesh and the wool, and by the ears. In Floyd & O'Neal's flock the witness saw other sheep which he believed were his, but their marks and brands had been so disfigured that he could not identify them. The average value of the sheep was about three dollars per head. The opinion of this court and the head notes show the objections raised by the defense to portions of the foregoing testimony.

L. A. Preston, for the State, testified that he was one of the party who went to Floyd & O'Neal's ranch and assisted in getting Mr. Stewart's sheep out of their flock. The witness corroborated Stewart's testimony with regard to the alterations and disfigurement of the marks and brands of the sheep, twelve of which were claimed by Stewart, and recovered. The defendant was at a camp some distance off, and did not see Stewart and his party get the sheep. Floyd was present. On the eighteenth of the same month of March, the witness and his companions had been at the same pen of Floyd & O'Neal. The defendant was with them on that occasion, and they made an appointment with him for a meeting at the pen, to see about this matter. Stewart's party, however, did not wait for the appointed day, but went on the twenty-second of the same month. They then had the defendant under arrest, away from the sheep.

John E. Preston, for the State, testified that, about the last of

January, 1882, he went to examine a flock of sheep which were kept at Arrington's ranch. He found the flock at an old place about a mile from Arrington's ranch. Witness rode all through the flock and looked at the sheep. He did not then see any of Stewart's sheep among them. This was the same flock which witness, on March 22, 1882, saw at the ranch of Floyd & O'Neal, which was four or five miles from Arrington's. On this latter occasion, the witness accompanied Stewart and others to the ranch of Floyd & O'Neal for the purpose of examining a flock of sheep in their possession. Witness helped Stewart catch and examine the sheep. Stewart claimed and took home with him twelve or thirteen of them. With regard to the alterations and disfigurement of the original marks and brands, the testimony of this witness accorded with that of preceding witnesses.

George Lord, for the State, testified that in 1880 or 1881, he sold a lot of sheep to J. C. Stewart. Some of the sheep claimed by Stewart at Floyd & O'Neal's pen were identified by this witness as part of the lot he had previously sold to Stewart.

Thomas Jackson, a freedman, was the next witness for the State. He testified that in 1882 he was working for Willis Arrington, but quit working for him in the summer of that year. Witness thought it was in the summer when he quit working for Arrington, but was positive that it was warm weather at the time. Jack Carter, Sam Hester and Russell Light, one night brought a lot of sheep branded S on the wool (which was Stewart's wool brand), and put them in Arrington's pen, and they were in the pen the next morning. Arrington, Russell Light, Jack Carter, Caleb Baker, the witness and the defendant, were there when the sheep were marked and branded. The defendant assisted in the branding of them. Up to the time these sheep were brought there, Arrington owned a gray horse which Sam Hester has owned since that time. Defendant was not with Carter, Light and Sam Hester, the night they brought the sheep to Arrington's. He was at Arrington's that night, and stayed there all night; though witness did not know where defendant was after bed-time. He was there the next morning. His home was at Arrington's. The marking and branding was done in a pen in Arrington's pasture, about half a mile from the house, and in the brush. Arrington kept these sheep at his ranch, and penned them at his house at night. He had a good large flock. In the daytime the sheep were usually herded out on the range near an old place about a mile west from Arring-

ton's. In going to this range they had to cross the public road from Cuero and Yorktown to Gonzales, which road is much traveled. Arrington's house is about half a mile from this road, on a high hill and in plain view from the road. His pasture fence runs along the east side of the road for a mile or more, and on the west of the road the country was uninclosed, and it was there the sheep were herded in the daytime. The next morning after the lot of sheep were brought by Carter, Light and Sam Hester, they were in the pen, and the defendant was at Arrington's house, where he lived. After breakfast the sheep were taken down to the pen in the pasture, and their ears were cut off, the brands on the wool clipped off and red paint smeared on, and a new brand was burned on their jaws. The defendant assisted in the marking and branding of the sheep.

The opinion discloses the questions arising on this witness's testimony.

J. L. Floyd, for the State, testified that on the first day of February, 1882, he bought from John Hester, the defendant, a flock of sheep numbering five hundred and seven head. The contract was made at Ferguson's on February 1, 1882, and on the next day C. J. O'Neal went and consummated it. O'Neal brought the sheep home, and kept them a while at the Gill place, and then took them to his place. When O'Neal brought the sheep home, witness noticed that they were freshly marked and branded; and it looked suspicious. They were kept until some of them were claimed and taken away by Stewart and others. The marks and brands on the sheep were fresh when O'Neal brought them home; their ears were sore, and some of them were bleeding. Witness paid Willis Arrington for them, for Hester or defendant. He paid three dollars per head. The bill of sale was signed by John Hester. About the twenty-second of March, 1882, Stewart got about twelve head out of the flock. When witness bought the flock the ears of the sheep were fresh cut and sore, the flesh brands were freshly run over, and the wool brands had been cut out and had red paint on them. The paint was washed off by the rain before Stewart claimed those which he got.

C. J. O'Neal, for the State, testified that he helped to purchase the sheep, and went to receive them on the second of February, 1882. By previous arrangement, for the purpose of counting the sheep, they had been put in a little old field about a mile from Arrington's ranch. Caleb Baker and witness rounded

them up in the field and drove them to the gate, where they were counted by Willis Arrington as Hester's representative, and James Ferguson as witness's. Witness got five hundred and seven head in all, which he bought from John Hester, and for which he paid three dollars per head. Witness noticed that the ears of the sheep were freshly cut, and that the brands also were fresh. Witness got a bill of sale for them. Stewart got about twelve of them. He and others had an agreement with defendant to meet at Floyd & O'Neal's pens, and settle the matter. Stewart's party, however, did not abide by the agreement, but came before the appointed time, and brought the defendant in arrest. They kept defendant at a camp some distance from the pens, while they went through the flock.

The State closed her evidence with the bill of sale from defendant to Floyd & O'Neal. It was as follows:

"State of Texas,    }
"County of Gonzales. }    This is to assertify all people by these presents that I have on this day, Feb. 2, 1882, sold to and delivered Charley O'Neal and Lee Floyd five hundred and seven head sheep, four hundred and fifty being in the H brand, mark (delineated), also fifty-seven head in brand T and mark (same as the other).

"JOHN HESTER.

"Witnesses:
    "THOS. BAKER.
    "J. H. FERGUSON."

The defense introduced no evidence.

*Fly & Davidson*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. What Stewart, the alleged owner of the sheep charged to have been stolen, was told by his herder about the opening of the sheep pen gate was hearsay, and not admissible as evidence. But, while it was error to admit this illegal testimony, it may be contended that it was immaterial and irrelevant to the issue, and that, if the other evidence in the case is sufficient to support the conviction, this court should not reverse. We believe this position to be correct in all cases except capital

ones. It is certainly correct with regard to civil cases and misdemeanors. (*Patton* v. *Gregory*, 21 Texas, 513; *Bigley* v. *The State*, 5 Texas Ct. App., 101.) In *Preston* v. *The State*, 4 Texas Court of Appeals, 200, which was a capital case, this court said: "When, in a case of this character, improper evidence is admitted over objections, and a bill of exceptions taken to the ruling of the court, we cannot look to the whole case to determine whether there is other testimony sufficient to establish defendant's guilt, or whether the verdict of the jury was not influenced by illegal evidence."

In *Haynie* v. *The State*, 2 Texas Court of Appeals, 168, which was a felony not capital, the rule is stated to be, that "the admission of illegal evidence of an *important* fact, *material* and *pertinent* to the issue, and which is in addition to other facts legally in evidence, is erroneous, and a conviction will not be permitted to stand, however certain it may be that the jury would have found a verdict of guilty upon other sufficient evidence adduced upon the trial." The converse of this proposition even in a felony case less than capital, would seem to follow, viz: that, if the illegal testimony was immaterial and irrelevant, and there was sufficient other evidence to support the conviction, such conviction would not be disturbed because of the error in admitting the illegal evidence. We believe such to be the correct rule of practice for this court in all cases except capital ones.

We must therefore inquire whether this hearsay testimony complained of was material and relevant to the issue. Defendant was charged with the theft of twelve head of sheep, the property of Stewart. It was in proof that Stewart kept his sheep fastened in a pen in the night time, and herded them on the range in the day time. It was the theory of the State, and the correct one we presume, that if there were any of Stewart's sheep stolen, they were stolen in the night time out of the pen in which they were confined. Stewart testified that he had lost about one hundred head of his sheep, some thirty of which had died, and a few had strayed off into his neighbors' flocks; but the balance of the one hundred lost sheep could only be accounted for upon the theory that they had been stolen from the pen. There was no direct evidence that the sheep had been stolen. No witness saw them taken. Circumstantial evidence alone was relied upon by the State to establish the taking.

This being the state of the evidence on the part of the prose-

·cution, would it not be a material, relevant and pertinent fact to prove that, about the time of the alleged theft, and prior thereto, ·Stewart's sheep pen had been opened by unknown persons in the night time. while the sheep were confined therein? Would not this circumstance tend strongly to support the testimony of Stewart that he had lost sheep from the pen, and that the same had been stolen ? Would it not very cogently support the theory of the State that sheep had been stolen from Stewart's pen. and in the night time, and shortly prior to the time when these alleged stolen sheep were discovered by Stewart ? It is not very probable that the alleged theft was committed in the ·day time, while the sheep were on the range and in the charge of a herder. Neither is it probable that the sheep escaped from the pen, and left the flock of their own volition. How, then, ac- ·count for the loss of so many sheep in so short a time ? There is but one answer to this question: They must have been taken from the pen by some person in the night time. It was, therefore, we ·conclude, not only material and pertinent but important for the State to prove that the pen had been opened, and such evidence must necessarily bear directly and strongly upon the issue as to' whether or not any of Stewart's sheep had in fact been stolen. It would have been competent testimony on the part of the pro- secution, and could not reasonably fail to strengthen the State's case.

It was within the power of the State to produce direct proof of this circumstance by placing upon the witness stand Stewart's herder. This was not done, nor was any reason assigned why it was not done. Circumstantial evidence should not be resorted to when direct evidence of the fact sought to be proved is attain- able,. and much less should mere hearsay evidence be relied upon.

We hold that the testimony of the witness Stewart as to the statements made to him by his herder was hearsay and inadmis- sible in evidence, and that the same was material and well cal-· culated to influence the verdict of the jury, to the prejudice of defendant's rights. The error of the court in admitting this ille- .gal evidence is sufficient of itself to demand a reversal of the judgment, and it is unnecessary to the present disposition of the case that we should discuss other questions presented in the re- ·cord; but, in view of another trial of the case, it is perhaps pro- per that we should notice some other matters which may again ·arise in the case.

Witness Stewart was permitted to testify, over the objections of defendant, that when he found his sheep in the flock of Floyd & O'Neal, he saw other sheep in the flock, the marks and brands of which were so badly disfigured that he could not identify them. It was in proof that defendant had sold this entire flock of sheep to Floyd & O'Neal, and that the marks and brands of nearly all of the twelve head of said sheep which Stewart claimed and took out of the flock had been changed and disfigured, the brand claimed by defendant being placed over the old brands of Stewart. This being the proof upon this subject, it would be a legitimate link in the chain of circumstances tending to connect the defendant with the theft of Stewart's sheep, to show that in the same flock of sheep which defendant had sold Floyd & O'Neal there were other sheep, besides those Stewart was able to identify, that had also been re-marked and rebranded, apparently at about the same time, and in such a manner as to prevent the identification of the sheep. It must be noted in this connection that Stewart testified he had lost from his flock sixty or seventy head of his sheep which he could not account for unless upon the theory that they had been stolen, and that he could only identify in the flock of Floyd & O'Neal twelve head of his sheep. It is our opinion that the court did not err in admitting this testimony. (*Satterwhite* v. *The State,* 6 Texas Ct. App., 609; *Williamson* v. *The State,* 13 Texas Ct. App., 514.)

Tom Jackson, a State's witness, testified that in the summer of 1882 (which was after the time the alleged theft had been committed, and after Stewart had recovered the twelve head of sheep claimed by him), he was present when a flock of sheep were driven to and penned at the place of one Arrington by one Sam. Hester and others, the defendant, however, not being one of the drivers of the sheep. That Sam. Hester traded those sheep to Arrington, and that defendant assisted in changing the marks and brands of the same. In some particulars the description of these sheep as given by this witness corresponded with the sheep found in the Floyd & O'Neal flock. But, if the witness was correct as to the *time* when this transaction occurred, they must have been a different lot of sheep, because this occurrence was subsequent to the sale of the flock to Floyd & O'Neal. If the sheep that witness testified about were a different lot of sheep from those found in the Floyd & O'Neal flock, then his testimony can have no connection whatever with the theft charged,

and would be wholly irrelevant. But, if he was mistaken as to *time*, and the transaction about which he testifies, instead of taking place in the summer of 1882, in fact took place in January or February, 1882, then his testimony would be pertinent and material. It may be that the jury concluded that the witness was mistaken as to *time*, and that the sheep he testified about were in fact the same sheep found in the Floyd & O'Neal flock, which had been sold to said Floyd & O'Neal by defendant. We think, therefore, that we must regard the testimony of this witness as material and calculated to probably enter into the consideration of the jury, and perhaps influence their verdict.

It was elicited from this witness, on the direct examination by the State, that the sheep about which he testified were brought to Arrington's by one Sam. Hester and two other persons, and that Sam. Hester traded the sheep to Arrington for a horse; that he knew the trade was made because he heard Sam. Hester and Arrington say they had so traded. The court of its own motion excluded Jackson's testimony as to having heard Sam. Hester and Arrington say they had traded. It was then proposed by the defendant to prove by this witness that he was present when Sam. Hester traded the sheep to Arrington for the horse and heard the trade made. Upon objection made by the State this proposed evidence was rejected.

It was the opinion of the trial judge that the testimony so excluded and rejected by him was hearsay and therefore not competent. In taking this view of the testimony, we think the learned judge erred. If this witness was present when any such trade was made, and heard the negotiations of the parties thereto, and heard them agree that they had traded, we cannot perceive why his testimony would not be as competent to prove the trade as would be that of the parties to the same. Such testimony would be original and not hearsay. That this testimony would be relevant and material would depend, as we have before stated, upon the conclusion of the jury as to whether or not the sheep testified about by this witness were the same sheep afterwards found in the Floyd & O'Neal flock. If they were the same sheep, or if the jury might so conclude, then the testimony would show, or at least tend to show, that they had been stolen before the defendant had any connection with them, and sold to Arrington, and that defendant had no connection with them until *after* they had become the property of Arrington; and it would further tend to show that he had purchased the sheep

from Arrington, for it was not until after the sheep had been penned at Arrington's that the defendant becomes connected with them by assisting in changing their marks and brands by placing upon them other marks and brands. If, in fact, he was not concerned in *taking* the sheep, but only became connected with them after they had been stolen by other parties, then he could not be convicted of the theft of them. We think the testimony which was excluded, and that which was offered by defendant and rejected, should have been admitted.

We must say in regard to the facts of this case, as presented to us in the statement of facts, that there is much uncertainty in respect to some particulars. The alleged stolen sheep were missing from Stewart's flock about the last of February, 1882. They were found in the Floyd & O'Neal flock in the latter part of March, 1882. This flock had been sold to Floyd & O'Neal by the defendant on the first day of February, 1882, and the bill of sale thereto was executed on the next day. Witness Jackson's testimony relates entirely to sheep which were at Arrington's in the summer of 1882, which was subsequent to the time of the alleged theft. Was this witness mistaken as to time? He says he was working for Arrington at the time, and quit working for him in the summer of 1882. It is of the highest importance that the *time* of the transaction which this witness testifies about should be definitely fixed, if his testimony is to have any bearing on the case. It seems to us that this could be done. When did the witness quit working for Arrington? What time in the summer of 1882. How long before he quit there was it that these sheep were brought there? What kind of work was the witness engaged in at that time? If engaged in farming, what particular work in that line was he doing at the time; preparing to plant, planting, or cultivating, or gathering crops? There seems to have been but little effort made to ascertain the important fact as to the *time* of the happening of the transactions related by this witness. Upon another trial it is to be hoped that this confusion may be removed and the mystery solved.

Again, the witness Jackson does not state what marks and brands were upon the sheep when brought to Arrington's; nor does he describe the brand which defendant assisted in placing upon them; nor does he state *when* this marking and branding occurred. These were important facts to be proved by this witness, and yet no effort appears to have been made to elicit them.

There were five hundred and seven head of the sheep sold by defendant to Floyd & O'Neal, four hundred and fifty of which were freshly branded in a brand claimed by defendant, and fifty-seven head were freshly branded in the Nations brand, which latter brand was owned by Mrs. Nations. In the bill of sale from defendant to Floyd & O'Neal, the two brands are made with a pen, the first resembling the letter H, with a cross stroke projecting beyond each of the upright strokes, so as to form a double cross, and the other being an upright line crossed at the top with a horizontal line, resembling the letter T. In the description of these brands, which had been recently placed on the sheep, the witnesses do not all agree, nor do the descriptions agree entirely with the brands represented in the bill of sale. Particularly is this the case with the new brand on the fifty-seven head of sheep, said to be in the Nations brand. We call attention to these discrepancies, not that we regard them as being very material, but that they may be, if possible, explained on another trial.

With respect to the charge of the court, we do not consider that it was materially erroneous when viewed as a whole. The exceptions taken to it we regard as hypercritical, rather than substantial; but, upon another trial, the learned judge will doubtless so frame his charge as to prevent even these objections.

Numerous special charges were requested by the defendant and refused by the court. In so far as these charges were correct and applicable to the evidence, we think they were embraced in the charge of the court; and, such being the case, it was not error to refuse them.

Because of the errors we have mentioned, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*